UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CATHERINE LEWIS,

                          Plaintiff,

-vs-                                                    Case No.  6:04-cv-1730-Orl-18JGG

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

                          Defendant.
_____

REPORT AND RECOMMENDATION

TO THE UNITED STATES DISTRICT COURT

        Plaintiff Catherine Lewis ["Lewis"] appeals to the district court from a final decision of the

Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability and disability insurance benefits.  *See* Docket No. 1 at ¶ 3 (complaint).[1]  For the reasons set

forth below, the Commissioner's decision should be AFFIRMED.

I.       PROCEDURAL HISTORY

        On May 14, 2001, Lewis filed a claim for disability insurance benefits, claiming disability as

of January 24, 2001.  R. 73.  On June 5, 2003, the Honorable Albert D. Tutera, Administrative Law

Judge ["ALJ"], held a hearing on Lewis's claim in Orlando, Florida.  R. 36 - 56.  Richard McCullough

represented Lewis at the hearing.  R. 38.  The ALJ heard testimony from Lewis only.

_____

        [1] Lewis also applied for supplemental security income payments ("SSI"), which were denied.  See R. 21, 28.
Lewis does not challenge the denial of SSI benefits in her Complaint.  See Docket 1.

On June 23, 2003, the ALJ issued a decision that Lewis was not disabled and not entitled to benefits.  R. 28.  Following a review of the medical and other record evidence, the ALJ found that Lewis could perform her past relevant work as a school bus monitor as the job is performed in the national economy.  R. 26; 27, Findings 8, 9.  The ALJ found that Lewis retained the physical residual functional capacity ["RFC"] to perform the physical exertional requirements of light work.  R. 27, Finding 7.  The ALJ further found that Lewis's nonexertional limitations restrict her to simple repetitive tasks.  *Id*.

After considering additional medical records, the Appeals Council denied review.  R. 11- 14. On November 30, 2004, Lewis timely appealed the Appeals Council's decision to the United States District Court.  Docket No. 1.[2]  On December 5, 2005, Lewis filed in this Court a memorandum of law in support of her appeal.  Docket No. 20.  On February 3, 2006, the Commissioner filed a memorandum in support of her decision that Lewis was not disabled.  Docket No. 23.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Lewis assigns five errors to the Commissioner.  First, Lewis claims that the Commissioner erred in determining that Lewis could perform her past relevant work as a school bus monitor. Second, Lewis claims that the Commissioner erred by failing to consider all of her impairments. Third, Lewis claims that the Commissioner erred in failing to give appropriate weight to Lewis's treating physician and the non-examining physician.  Fourth, Lewis claims that the Commissioner

---

[2] Lewis requested and received an extension of time from the Appeals Council to file her civil action.  R. 6.

incorrectly determined that Lewis's testimony regarding her condition was not credible.  And finally, Lewis contends the ALJ erred in failing to obtain testimony from a vocational expert.

The Commissioner argues that substantial evidence supports her decision to deny disability. Specifically, the Commissioner argues that Lewis bore the burden of proving that she was unable to perform her past relevant work.  The Commissioner also contends that the ALJ appropriately weighed the physicians' opinions and the evidence regarding Lewis's subjective complaints.   The Commissioner does not respond to Lewis's argument that the ALJ erred in failing to obtain testimony from a vocational expert.  Docket No. 23.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.     REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405(g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984). A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.     REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson*

-4-

*v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence

which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988);  *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986);  *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986);  *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[3]  *Id.*

### D.    STANDARD OF REVIEW WHERE APPEALS COUNCIL CONSIDERS NEW EVIDENCE

After the ALJ's decision — but before the Appeals Council decision — Lewis submitted additional medical records covering the time period from January 30, 2003 through July 23, 2003. R. 427-31.  If a claimant submits evidence that does not relate to the relevant period under

---

[3]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*  Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Commissioner*, __ F. 3d __, 2006 WL 1843633 n.11 (11th Cir. July 6, 2006).

consideration, "the Appeals Council will return the additional evidence to [the claimant] with an explanation as to why it did not accept the additional evidence and will advise [the claimant] of [his or her] right to file a new application." 20 C.F.R. § 404.976(b)(1)(2005).  The Appeals Council did not return the additional evidence to the claimant.  Rather, the Appeals Council properly made the evidence a part of the record, and also considered the evidence in denying review.  R. 11.  The district court also must consider the new evidence in determining whether the Commissioner erred in denying review of the ALJ's decision.

Congress left the term "final decision" undefined in 42 U.S.C. § 405(g).  Where a claimant exhausts his administrative remedies by requesting review by the Appeals Council and the Appeals Council then denies review,  the Appeals Council's order denying review is a "final decision" of the Commissioner under § 405(g).  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2083 (2000); *accord*, *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Williams v. Comm'r of Soc. Sec.*, 407 F. Supp. 2d 1297, 1302-03 (M.D. Fla. 2005) (Appeals Council's denial is a final decision of the Commissioner that is subject to judicial review under section 405(g).  The Appeals Council "will" review a case if there appears to be an abuse of discretion by the ALJ, if there is an error of law, or if the ALJ's action, findings, or conclusions are not supported by substantial evidence.  20 C.F.R. § 416.1470; *Sims*, 120 S.Ct. at 2086; *see also, Parker v. Bowen*, 788 F.2d 1512, 1518 (11th Cir. 1986) (en banc).  The Appeals Council's denial of review is subject to judicial review to determine if it is supported by substantial evidence. *Sims*, 120 S.Ct. at 2086.

Just as the ALJ has a duty to investigate the facts and to develop the arguments both for and against the granting of benefits, the Appeals Council's  review is similarly broad.  *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000).  The Appeals Council, not the claimant, has the primary

responsibility for identifying and developing the issues. *Sims*, 120 S.Ct. at 2086. When the Appeals Council refuses to consider new evidence submitted to it and denies review, the Appeals Council's decision denying review is subject to judicial review. 20 C.F.R. §§ 404.970(b); 416.1470(b); *Sims*, 120 S.Ct. at 2086; *Keeton v. Dep't of Health & Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994). Furthermore, the Appeals Council commits reversible error when it refuses to consider new evidence and then denies review. *Keeton*, 21 F.3d at 1066. Similarly, it is *reversible error* for a district court to consider only the evidence presented to the ALJ — and to ignore the new evidence presented to the Appeals Council — in reviewing a decision of the Appeals Council. *Keeton*, 21 F.3d at 1066.

The Appeals Council must consider and evaluate new evidence to determine whether there is a basis for changing the ALJ's decision. *Sims*, 120 S.Ct. at 2086; *Falge v. Apfel*, 150 F.3d 1320, 1322 n. 4 (11th Cir. 1998). When the Appeals Council has denied review, the district court looks only to the evidence actually presented to the ALJ in determining whether the *ALJ's decision* is supported by substantial evidence. *Falge*, 150 F.3d at 1323; *accord, Eads v. Sec'y of Health & Human Services*, 983 F.2d 815, 817 (7th Cir. 1993) (ALJ cannot be faulted for failure to weigh evidence never presented to him). Nevertheless, there is an important difference between *Falge* and this case — a difference stressed by the United States Court of Appeals for the Eleventh Circuit. In *Falge*, the claimant did not appeal the Appeals Council's decision to deny review. Instead he appealed only the *ALJ's decision* to deny benefits. 150 F.3d at 1324. In this case, however, the claimant appeals from the Commissioner's decision, which could be construed as including the Appeals Council's decision to deny review. Docket No. 1 at 2. The Eleventh Circuit directs the district courts to consider evidence submitted to the Appeals Council in reviewing the Appeals Council's denial of review.

*Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066; *accord, Higgenbotham v. Barnhart*, 405 F.3d 332, 337-38 (5th Cir. 2005); *Williams*, 407 F. Supp. 2d at 1303.

Indeed, it makes sense that Congress has provided for judicial review of the Commissioner's final decision — the last step of review necessary to exhaust administrative remedies.  When the Appeals Council refuses to consider new evidence submitted to it, the Appeals Council's decision denying review is subject to judicial review for error.  *Sims*, 120 S.Ct. at 2086;  *Keeton*, 21 F.3d at 1066.  Similarly, when the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324;  *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the relevant period, and it will then review the case if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).  The Commissioner cannot avoid judicial review of the Appeals Council's decision to deny review by considering but not acting on new evidence that is highly probative of disability, or by considering but not acting on evidence that shows in retrospect that an ALJ's action, findings, or conclusion are contrary to the weight of the evidence currently of record.

In this case, the claimant has appealed an unfavorable decision to the Appeals Council as a necessary step in exhausting administrative remedies.  The Appeals Council has considered claimant's additional evidence in light of the issues raised in the request for review, has considered the applicable statutes and regulations, has considered the ALJ's decision, and has issued a written final decision determining that the ALJ neither erred nor abused his discretion, and determining that the ALJ's

findings are supported by substantial evidence.  The Appeals Council's determination is subject to judicial review.  The Commissioner cannot avoid judicial review of the Appeals Council's final decision by passing a regulation defining the term "final decision of the Commissioner of Social Security" in 42 U.S.C. § 405(g) as the decision of the ALJ, and by calling the Appeals Council's final decision a "denial of review."  *See Sims*, 120 S.Ct. at 2086;  *accord, Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (Appeals Council's denial of review was a judicially reviewable final decision under 42 U.S.C. § 405(g));  *Williams*, 407 F. Supp. 2d at 1302-03.

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

-10-

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

## B.     THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in

the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"]. This assessment measures whether a claimant can perform past relevant work despite his or her impairment. 20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull. *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant. *See* SSR 82-61. If so, the claimant is not disabled. If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy. SSR 82-61. In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy. 20 C.F.C. § 404.1567.

-12-

The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c). If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability. *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

## C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).

In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).  Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed

-15-

impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1529. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.  CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

## H.    THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — *i.e.,* limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-18-

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands

(stress).  This information can be provided by programs such as community mental health centers, day

care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning

given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with

the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to

resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the

individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404,

Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or,

conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of

functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R.

Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently

long period prior to the date of adjudication in order to establish the individual's impairment severity.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge

summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent

to the determination of disability.  Information concerning the individual's behavior during any

attempt to work and the circumstances surrounding termination of the work effort are particularly

useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt.

404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who

have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy

and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

## V.   APPLICATION AND ANALYSIS

### A.   THE FACTS

Lewis was born on January 2, 1960, and was 43 years old at the time of the ALJ's decision. R. 21-28, 73.  She has a ninth grade education and past work experience as a school bus monitor.  R. 47, 106-08, 113, 116, 121, 124-25.

On May 18, 1999, Alex Mescavage, M.A., L.M.H.C. of Florida Physiatrics Associates noted that Lewis had mild symptoms of depression due to marital problems. R.147.  On September 22, 2000, Lewis saw Dr. Perth Blake, M.D., for pain when taking a deep breath. R. 253.  Lewis reported that the pain first occurred that morning and lasted a short period of time.  *Id*.  Dr. Blake's assessment of Lewis based on her medical history was that Lewis had a history of right shoulder pain, right sided numbness and weakness, and it appeared to be of significance that Plaintiff gets fatigued when active for any length of time, insomnia, and possible pleurisy.  *Id*.

On March 5, 2001, Lewis saw Dr. Michael B. Rozboril, M.D. for an evaluation of her pain. R. 190.  Lewis reported she had been diagnosed with a bone spur, for which she had arthroscopic debridement, and that she had subacromial bursitis in February 2000.  R. 190.  Dr. Rozboril's impression was that Lewis suffered from myalgia, carpal tunnel syndrome, and bursitis of the shoulder. R. 189.  Treatment was to include a wrist splint, physical therapy, massage, as well as medication. R. 189.  Dr. Rozboril's records indicate subjective complaints of generalized fatigue, neuromuscular parasthesias, muscle pain, muscle weakness and unspecified psychiatric issues. R. 190.

On March 15, 2001, Dr. Stephen A. Bookbinder, M.D. had an overall impression that Lewis had fibromyalgia, cervical, benign familial hypermobility syndrome , right upper extremity pain and numbness in right hand. R, 208.  Dr. Bookbinder noted that carpal tunnel and cervical radiculopathy

-22-

were possible causes.  *Id.*  He also noted weight bearing lower extremity pain and low back pain that was possible caused by lumbar radicular pain and patella femoral osteoarthritic in the knees.  *Id.*  His plan was to obtain appropriate laboratory tests and x-rays.  *Id.*  Dr. Bookbinder also noted that Lewis complained of persistent depression and anxiety.  R. 207.  He prescribed medication and instructed Lewis to start getting aerobic exercise.  R. 208.

At a follow up exam on April 5, 2001, Dr. Bookbinder noted improvement in Lewis's sedentary pain.  R. 206.  Lumbar spine x-rays showed disk space narrowing which appears chronic at L-5, S-1 and there was possible narrowing at L-1 and L-2.  R. 205-06.  Dr. Bookbinder's impression was fibromyalgia, cervical and lumbar spondylosis, possible radiculopathy, particularly in the right lower extremity, possible upper extremity radicular symptoms.  R. 206.

On April 9, 2001, Lewis had a follow up visit with Dr. Rozboril.  R. 187.  Lewis reported that her right hand gets numb with certain activities, she wears a brace at night with some relief and as needed during the day, and she gets burning in legs.  R. 187.  She is receiving physical therapy to her neck with some relief. R. 187.  Dr. Rozboril's diagnosis was carpal tunnel syndrome, cervicalgia (pain in neck), and bursitis of the shoulder.  R. 187.

An MRI of the lumbar spine conducted on April 1, 2001, noted disc bulging at L5-S1, which very mildly compressed the right S1 nerve root in the nerve root recess, and no significant neuroforaminal narrowing.  R. 209.  The MRI also showed degenerative disc disease at L1, L2, L4 and L5-S1.  R. 209.

On May 16, 2001, Dr. Bookbinder noted that Lewis had a herniated disc at C6-7, causing intermittent right arm pain and weakness.  R. 204.  Dr. Bookbinder further noted Lewis had mild left

arm pain and weakness, and problems with weight bearing, right lower extremities pain, and pain in the right lower extremities when sitting which correlated with L5-S1 disc seen on MRI. R. 204.

On May 22, 2001, Dr. Rozboril saw Lewis for low back pain. R. 185. The impression was low back pain syndrome (724.2) and DDD with disc bulge at L5-S1. *Id*. Based on the MRI of LS spine, Dr. Rozboril did not see anything that suggested permanent disability. *Id*. Dr. Rozboril recommended physical therapy and a low back brace with follow up in two months. *Id*.

On June 25, 2001, physical therapist Leigh Delgado, RPT noted that Lewis initially (on June 6, 2001) had high pain levels (10/10) of neck, right arm, lower back, right hip, right knee, as well as limited lumbar range of movement. R. 170-73. Within three weeks, Lewis's pain level was reduced to a 6-7/10 at its worse with "good days" and "bad days." R. 170. The pain was located primarily in the neck, right arm, lower back, right hip and knee. R. 173. Lewis reported she was experiencing headaches, sleep disturbance, dizziness, fatigue, weakness, and occasional loss of balance. Lewis further reported the pain increased with driving, sitting more than ten minutes, and housework and that she was unable to work due to the pain. R. 173.

On July 2, 2001, Dr. Bookbinder completed a form for disability determination in which he stated that Lewis did not suffer from a mental impairment that significantly interfered with her daily functioning. R. 203.

On July 25, 2001, Dr. David R. Cox, Ph.D., conducted a general clinical evaluation with mental status examination. R. 182. Dr. Cox diagnosed Lewis with major depression and fibromyalgia. R. 183. He opined that Lewis had low average ability to interact with others, low average ability to maintain attention, concentration, and pace, and low average ability to withstand the stress of a routine workday and adapt to change. R. 183.

On July 30, 2001, Dr. Rozboril noted that Lewis had tender neck and trap muscles. R. 184. His impression was fibromyalgia (729.1), cervical spondylosis without myelopathy (721.0), breast cancer (174.9) and depression. Dr. Rozboril indicated "[a]t this time she appears unable to return to work due to multiple complicating problems." R. 184.

On August 3, 2001, Dr. Jim Takach, M.D., conducted a Residual Functional Capacity Assessment. R. 193-200. Dr. Takach's primary diagnosis was fibromyalgia, with a secondary diagnosis of Stage I breast cancer. R. 193. With respect to the breast cancer, Dr. Takach noted that Lewis had recently been diagnosed, and had undergone a lumpectomy. R. 195. Lewis was healing nicely from her surgery and had a good prognosis. R. 195. Dr. Takach opined Lewis could occasionally lift 20 pounds, frequently 10 pounds, and sit six hours in an eight hour day. R. 194. He further noted that Lewis had diffuse myofascial pain, right shoulder decompression, as well as pain, and postural limitations of occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, and avoidance of hazards, including machinery and heights. R. 194, 195, 197.

On August 10, 2001, Dr. Bookbinder completed a disability determination form. R. 202. Dr. Bookbinder stated that he had treated Lewis beginning April 5, 2001, and that he last visit was on May 16, 2001. *Id.* Dr. Bookbinder restricted Lewis from sitting or walking for "extended periods of time" due to the lumbar spondylosis and cervical spondylosis. *Id.* Although noting that Lewis had not reached the maximum medical improvement, Dr. Bookbinder opined that Lewis could not perform sedentary or weight bearing work, and that she was permanently incapable of any kind of work. *Id.* Dr. Bookbinder did not state the basis for his opinion, or what it was about Lewis's condition made her unable to work. *Id.*

On September 14, 2001, Dr. James Mendelson, Ph.D., conducted a Mental Residual Functional Capacity assessment. R. 213-230. Dr. Mendelson rated Lewis as being "moderately limited" in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and work week without interruption from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number or length of rests. R. 227-28. In all other areas, Lewis was not significantly limited. *Id*. Dr. Mendelson opined that Lewis had an adjustment disorder with mixed emotional features that was not of disabling proportions. R. 229. He stated that Lewis had no discernible impairments in the functional capacity for a full range of routine day to day behaviors required for personal care, independent living, and reasonable social/avocational pursuits. R. 229. He further stated that Lewis could be reasonably expected to accomplish most simple, unskilled, repetitive assignments with at least adequate comprehension and memory, social functioning, adaptations, concentration and persistence. R. 229.

On September 26, 2001, Dr. Blake evaluated Lewis, noting that she had fallen two weeks previously. Dr. Blake assessed the Plaintiff as having lower back pain, cervical and lumbar spine spondylosis, possible depression, and a history of rotator cuff tear. R. 240. Dr. Blake informed Lewis that he was uncomfortable declaring her totally permanently disabled, and that she needed to see a spine specialist or neurosurgeon. R. 240.

Dr. Blake referred Lewis to Dr. Elias M. Gizaw, M.D. with Florida Neurology to evaluate Lewis for gait ataxia. R. 318. Dr. Gizaw saw Lewis on November 21, 2001. *Id.* Lewis reported that over the past year she had difficulty with ambulation and balance, and recently she had two falls. *Id.* On clinical examination, Dr. Gizaw noted that Lewis had some difficulty with tandem walking, and

that Romberg sign was negative.  R. 319.  He further noted that Lewis's motor tone and strength were symmetrical and intact in both upper and lower extremities.  R. 319.  Dr. Gizaw opined that Lewis's ataxia and dysequilibrium was probably due to medication side effects.  R. 318-20.  He planned to conduct an MRI of the brain to rule out metastic disease, and to check her B12 and thyroid levels.  R. 320.

On December 7, 2001, Dr. James J. Green, M.D. completed a Physical Residual Functional Capacity Assessment.  R. 255-62.  Dr. Green's primary diagnosis was Stage 1 breast cancer and secondary diagnosis of back and neck pain.  Dr. Green found that Lewis had chronic neck and back pain, several bulges, mild degenerative changes, cervical HNP at C5-6, and no neurological deficits.  R. 256. Dr. Green opined that Lewis could occasionally lift twenty pounds, frequently ten pounds, stand six hours in an eight hour work day, sit about six hours in an eight hour work day, occasionally climb, balance, stoop, kneel, crawl, and crouch.  R. 256-57.  She had no push/pull limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations, except to avoid concentrated exposure to open heights.  R. 256-59.

On December 14, 2001, Lewis had an MRI of the brain, which was ordered by Dr. Gizaw. Dr. Marshall Pearlman, M.D. interpreted the MRI and found a developmental cystic area that was not of clinical significance.  The MRI was otherwise negative.  R. 266.

On January 4, 2002, Dr. Don F. Driggs, Ph.D. completed a Mental Residual Functional Capacity Assessment.  R. 293-312.  Dr. Driggs diagnosed Lewis as having an affective disorder. R. 293.  Dr. Driggs also opined that Lewis had a major depressive disorder that did not satisfy the diagnostic criteria.  R. 296.  Dr. Driggs found Lewis to have a mild degree of limitation in restriction of daily living and difficulties in maintaining social functioning.  R. 303.  Lewis was moderately

limited in maintaining concentration, persistence or pace.  R. 303.  Further, she had one or two episodes of decompensation, which was a degree of limitation that did not satisfy the functional criterion.  R. 303.  Dr. Driggs concluded that Lewis was medically capable of performing light work. R. 306.

On January 10, 2002, Dr. Gizaw at Florida Neurology performed a nerve conduction study and electromyogram.  R. 315.  The results were normal.  R. 315.  On January 11, 2002, neurologist, Dr. Christopher J. Baker, conducted an initial evaluation to determine if Lewis required surgical intervention.  Dr. Baker concurred with the diagnosis of fibromyalgia, but determined Lewis did not require surgery.  R. 345.  Her physical examination showed that she was not in acute distress.  R. 344. Her neurological examination showed that cranial nerves II-XII were intact, and her motor exam was 5/5 throughout.  R. 345.  Her reflexes are 1+ and symmetric and her gait is normal.  *Id*.  Her speech was fluent and prosodic, she could repeat serial sevens and her memory is 3 out of 3 at three minutes. *Id*.  Imaging studies from January 27, 2001, showed a normal thoracic spine.  *Id*.  She had minimal degenerative changes at L4-5 and L5-S1, which were not significant.  *Id*.  She had some mild spondylitic disease at C5-6 without frank disc herniation or foraminal narrowing. *Id*.

On January 29, 2002, Dr. Christopher Baker, M.D., a neurosurgeon, completed a Florida Retirement System Physician's Report.  R. 346-47.  Dr. Baker diagnosed Lewis with nerve root compression and fibromyalgia.  R. 347.  Dr. Baker opined that Lewis had a severe limitation of functional capacity, was permanently incapable of any kind of work, and totally and permanently disabled from gainful employment.  R. 347.

On February 11, 2002, Lewis had a follow up visit with Dr. Gizaw during which he opined that Lewis's symptoms were probably related to fibromyalgia.  R. 314.  He found that Lewis responded

to medication and would try increasing her medication levels.  *Id*.  Dr. Gizaw recommended that Lewis follow up with a rheumatologist for her fibromyalgia symptoms.  *Id*.

On May 16, 2002, Dr. Bookbinder noted that Lewis's fibromyalgia symptoms were somewhat worse, and that she had a lot of situational stress in her life.  R. 372.  At a follow up visit on August 15, 2002, Dr. Bookbinder found that Lewis's emotional stress was better.  R. 371.  He additionally diagnosed Lewis with bursitis in her right shoulder and gave her an injection.  R. 371.

On June 13, 2002, Alex B. Sharp, LMHC, CAP, conducted a mental health evaluation of Lewis.  Sharp's impressions were Axis I:  major depressive disorder, recurrent, severe [296.33]; Axis II: dependent personality disorder [301.6]; Axis III:  breast cancer in remission and fibromyalgia per medical history.  R. 404-405.  Sharp noted that Lewis had a long history of depression, a great deal of which appeared to link to various physical problems and relationships.  R. 406.  Sharp referred Lewis to the psychiatrist/ARNP for review.  R. 406.

On December 3, 2002, Laletha Craas, LNP noted Lewis's problems as depression, anxiety, insomnia, lack of energy and motivation, and anhedonia.  The Plaintiff was noted to have major depressive disorder as well as fibromyalgia.  Craas stated Lewis had a long history of depression due to her husband leaving her one year ago, she lost her home, she had cancer, her daughter just returned from jail, and many losses of family members.  R. 377-80.

One December 3, 2002, the Plaintiff submitted to a Beck Depression Inventory prepared by Alice Stephens, LCSW, in which it was noted that the Plaintiff had severe depression.  R. 384-87.  On January 7, 2003, the Physician's Progress Note states that Lewis is doing better, and the Prozac is more effective.  R. 375.  On March 13, 2003, Dr. Bookbinder indicated that Lewis was having some

problem with nocturnal pain in the right trochanteric bursa and diffuse soft tissue pain.  He prescribed Trazodone.  R. 369.

Lewis submitted additional evidence to the Appeals Council — an insurer's Attending Physician's Statement completed by Dr. Bookbinder on July 23, 2003.  R. 427-28.  Dr. Bookbinder opined that Lewis ceased work due to disability on March 15, 2001.  R. 427.  In response to the question whether he supported claimant's candidacy for Social Security Disability benefits, Dr. Bookbinder responded "yes."  R. 428.  Dr. Bookbinder opined that Lewis had osteoarthritis and fibromyalgia.  R. 427.  His diagnosis was supported by symptoms of diffuse tenderness on examination, but not on x-rays, EKG's, or laboratory data. R. 427.  He limited Lewis from lifting over five pounds, but placed no limits on standing, bending or walking.  R. 427.  Dr. Bookbinder opined that Lewis had a severe physical limitation of functional capacity and was incapable of minimal sedentary activity. R. 428.  As to Lewis's mental impairments, Dr. Bookbinder opined that Lewis was markedly limited, and unable to engage in stressful situations or in interpersonal relations.  R. 428.  Dr. Bookbinder concluded that Lewis was not a suitable candidate for further rehabilitation, nor any other work, and indicated that Lewis's employment could not be modified to allow for the impairment.  R. 428.

**B.     THE ANALYSIS**

1.   **The ALJ Appropriately Supported His Findings Regarding Lewis's Credibility**

The ALJ found that Lewis's allegations regarding her limitations were "not totally credible for the reasons set forth in the body of the decision."  R. 27, Finding 5.  The ALJ found that Lewis's testimony regarding her pain and functional limitations were somewhat exaggerated and

disproportionate to the diagnostic and clinical findings.  R. 25.  The ALJ made specific references to

Lewis's testimony that depression was her worst problem (R. 45), yet her treating physician,

Dr. Bookbinder, found she only had mild depression, and Lewis's therapist opined that her condition

had improved with medication.  R. 25.  The ALJ also found that Lewis's testimony that she could only

lift five pounds, stand or walk for a few minutes at a time, and sit for only about an hour lacked

medical support as shown by Dr. Gizaw's neurological examination, which revealed normal results.

R. 25.  The ALJ further noted that Lewis's testimony regarding her limitations was contradicted by

other testimony that she was able to drive, grocery shop, cook and visit with family, and do light

household chores.  R. 25.[4]

        The ALJ has clearly articulated the basis for his credibility finding with substantial supporting

evidence in the record.  The Court, therefore, finds no error on this basis.  *See Hale v. Bowman,* 831

F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

### 2.     The ALJ Gave Appropriate Weight to the Physicians' Opinions

        Lewis contends the ALJ erred in failing to give controlling weight to Dr. Bookbinder's

opinion, her treating physician, that Lewis could not perform sedentary or weight bearing work.  The

ALJ gave little weight to Dr. Bookbinder's assertion that the claimant is limited to sedentary work

because of lower extremity pain, as his assessment dated April 5, 2001, predated Dr. Gizaw's

early 2002 neurological assessment in which Dr. Gizaw noted a normal MRI of the brain and nerve

conduction studies of the lower extremities were within normal limits.  R. 25-26.  Based on

---

        [4] Additional evidence that contradicts Lewis's testimony regarding her limitations are Dr. Takach's opinion that
Lewis could occasionally lift 20 pounds, frequently 10 pounds, and sit six hours in an eight hour day.  R. 194. Dr. Green
also opined that Lewis could occasionally lift twenty pounds, frequently ten pounds, stand six hours in an eight hour work
day, sit about six hours in an eight hour work day, occasionally climb, balance, stoop, kneel, crawl, and crouch.  R. 256-57.

Dr. Gizaw's objective data, Dr. Gizaw concluded that Lewis's symptoms were probably related to fibromyalgia. The ALJ further stated that given the evidence in its entirety and from a longitudinal perspective, it is clear that Lewis is and has been capable of light work.  R. 26.

Initially, the ALJ slightly misstates the record.  Dr. Bookbinder's assessment on April 5, 2001, did not state Lewis was unable to work.  See R. 205-06.  Rather, that statement was in the disability determination form that Dr. Bookbinder completed on August 10, 2001.  R. 202.  In that form, Dr. Bookbinder stated that he had treated Lewis beginning April 5, 2001, and that the last visit was on May 16, 2001.  *Id*.  Although noting that Lewis had not reached the maximum medical improvement, Dr. Bookbinder opined that Lewis could not perform sedentary or weight bearing work, and that she was permanently incapable of any kind of work.  *Id*.  The ALJ, however, is correct that Dr. Bookbinder's opinion preceded the MRI of the brain and the nerve conduction studies.  R. 266, 315.

The ALJ also found that Dr. Bookbinder's and Dr. Rozboril's opinion that Lewis suffered from a herniated disc was not supported by the medical evidence.  R. 24.  Lewis argues that the records show that she was diagnosed as having a lumbar disc bulge at L5-S1.  R. 185.  Although a disc bulge may be a precursor to disc herniation, they are distinct conditions.  Further, even though the MRI showed a disc bulge, Dr. Rozboril did not see anything that suggested permanent disability.  R. 185.

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580.  The ALJ also may reject any medical opinion if the evidence supports a contrary finding.  *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986).

Dr. Bookbinder's opinion that Lewis was completely unable to work was made after approximately five weeks of treatment at a time when Lewis had not reached her maximum medical

-32-

improvement.  Further, Dr. Bookbinder failed to state the basis for his conclusion that Lewis could not work, *i.e.*, he did not identify any particular symptom (*e.g.*, pain) that caused disability or rely on any laboratory or clinical evidence.  Dr. Bookbinder's opinion was conclusory, and could have been rejected on that basis.  Further, although Dr. Gizaw's evaluation was limited to assessing Lewis for gait ataxia, he performed both clinical and laboratory testing, and found Lewis's condition was related to medication.  Indeed, a subsequent examination by another doctor revealed Lewis to have a normal gait.  See, R. 345 (Dr. Baker, January 11, 2002).  Given the record, it was permissible for the ALJ to give greater credit to Dr. Gizaw's opinion than to Dr. Bookbinder's.

Although Lewis refers to the additional evidence she submitted to the Appeals Council in the recitation of facts, her memorandum does not argue that the Appeals Council erred in failing to reverse or remand the case to the ALJ based on the additional evidence.  When the Appeals Council denies review of an ALJ's decision after receiving, considering, and evaluating new and material evidence that clearly and thoroughly undermines the ALJ's findings of fact and conclusions of law, the Appeals Council's decision denying review also must be subject to judicial review for error.  *See Falge*, 150 F.3d at 1324; *Keeton*, 21 F.3d at 1066, 1068; 20 C.F.R. § 404.970(b) (Appeals Council shall evaluate the entire record, including the new and material evidence submitted, if it relates to the relevant period, and if it finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record).

The Appeals Council did not err in this case.  The additional evidence did not clearly undermine the ALJ's findings of fact or conclusions of law.  The main distinction between Dr. Bookbinder's opinion on August 10, 2001, and his opinion on July 23, 2003, is the length of time that he treated Lewis.  Although Dr. Bookbinder provides medical diagnoses of osteoarthritis and

fibromyalgia, he still does not identify specifically what caused Lewis's alleged disability (although pain is suggested based on her subjective symptoms of diffuse tenderness). R. 427. Dr. Bookbinder's opinion still is unsupported by any laboratory or clinical data. Further, his opinion that Lewis is ambulatory, with no restrictions on standing, bending or walking, and a five pound lifting restriction contradicts his conclusion that Lewis is incapable of even sedentary activity. Given the conclusory and contradictory nature of Dr. Bookbinder's opinion, it was not error for the Appeals Council to reject it.

3.   <strong>The ALJ Considered All of Lewis's Impairments</strong>

Lewis alleges that the ALJ failed to take into account the effect of her pain, difficulty concentrating, and difficulty maintaining pace or persistence in finding that Lewis could perform her past relevant work. Docket 20 at 15. Lewis's argument in unsupported by the record.

The ALJ's decision provides numerous record references to Lewis's evidence of her pain. R. 23- 24. The ALJ specifically addressed Lewis's pain and, while acknowledging Lewis experienced some pain, he found that her testimony regarding her pain was exaggerated. R. 25. The Court already has addressed the ALJ's determination of Lewis's credibility, which applies equally here. The ALJ also summarized those findings regarding lack of concentration, pace and persistence. R. 23, 26. Further, the ALJ specifically stated that he considered all of Lewis's symptoms and all of the evidence in making his determination. R. 21, 24, 27 Finding 6. There was no error in failing to consider all of Lewis's impairments.

4.      **Plaintiff Failed to Establish that She Could Not Perform Her Past Relevant Work**

Lewis argues that the ALJ erred in failing to make findings of fact regarding the physical and mental demands of her past relevant job as school bus monitor.  As to the physical requirements of her past relevant work, Lewis also apparently faults the ALJ for relying on the description of work contained in the Dictionary of Occupational Titles (DOT 372.667-042) instead of Lewis's description of the work she actually performed.

A claimant is not disabled if she retains the physical and mental capacity to perform *either* "1. The actual functional demands and job duties of a particular past relevant job; or 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy."  SSR 82-61, 1982 WL 31387, at *2.  *See also*, 20 C.F.R. § 404.1520(f) ("If you can still do this kind of work [past relevant work], we will find that you are not disabled." ); SSR 82-62, 1982 WL 31386 *3 ("The RFC to meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of 'not disabled.'").

In determining whether a claimant can perform her past relevant work, the regulations provide that the Commissioner "may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' [(DOT)] and its companion volumes and supplements, published by the Department of Labor [(DOL)]. . . ." 20 C.F.R. § 1560(b)(2).  The DOT was last updated in 1991 and, according to the DOL website, the DOT has been replaced by the O*Net.  The O*Net, however, does not contain a job description for school bus monitor.

In this case, Lewis did not request the services of a vocational expert or specialist to assist in the development of evidence regarding her past relevant work.  Further, the regulations do not mandate the use of a vocational expert at this stage.  It was within the ALJ's discretion to determine the demands of Lewis's past relevant work based on her particular job or the job duties as generally required in the national economy.  The DOT provides substantial evidence for the ALJ to determine that Lewis's past relevant work had light exertional demands.  R. 26.[5]

The claimant bears the burden of proving she is unable to perform her previous work.  *Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990).  Lewis's job description with Orange County Public School District described the physical aspects of her job as involving "moderately physically demanding work,"  including "some combination of climbing and balancing, stooping, kneeling, crouching and crawling, and that may involve the lifting, carrying, pushing and/or pulling of moderately heavy objects and materials (20-50 pounds)."  R. 125.  It was Lewis's burden to prove that the type of work required by her former employer was the type of work required for her position in the national economy.  Lewis did not introduce any such evidence and, therefore, failed to prove that her past relevant work required lifting up to 50 pounds.  *See, Jackson v. Bowen*, 801 F.2d 1291, 1293 (11th Cir. 1986) (a link belt operator whose prior job required him to also climb and descend stairs failed to carry his burden of proof that he could not perform his past relevant work where the claimant

---

[5]       The job description of school bus monitor listed in DOT 372.667-042 provides: Monitors conduct of students on school bus to maintain discipline and safety: Directs loading of students on bus to prevent congestion and unsafe conditions. Rides school bus to prevent altercations between students and damage to bus. Participates in school bus safety drills. May disembark from school bus at railroad crossings and clear bus across tracks.
    GOE: 04.02.03 STRENGTH: L GED: R2 M1 L2 SVP: 2 DLU: 77
Dictionary of Occupational Titles (4th ed., rev. 1991).

failed to show that climbing or descending stairs is generally required of link belt operators); *Andrade v. Sec'y of Health & Human Serv.*, 985 F.2d 1045, 1052 (10th Cir. 1993) (claimant failed to carry burden of proof that he could not perform his past relevant work of general contractor, in which he also actually performed plumbing and carpentry, because he failed to show that these demands are among the job duties generally performed by general contractors).

A.     **Findings of Fact Regarding Lewis' Ability to Meet the Physical Demands of Her Past Relevant Work**

The ALJ found that the job of school bus driver as defined in the DOT required "light exertional demands." R. 26.  The finding of light work is supported by the definitional trailer of DOT 372.667-042.  "Light work" is defined as:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible. NOTE: The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the  amount of force exerted is negligible.

Dictionary of Occupational Titles (4th ed., rev. 1991), Appendix C "Components of Definition Trailer."

The ALJ further found that Lewis retained the "physical residual functional capacity to frequently lift/carry up to 10 pounds, occasionally lift/carry up to 20 pounds, walk/stand or sit about

six hours of an 8-hour workday, and push/pull without restriction. She may occasionally climb ramps/stairs, reach overhead, balance, stoop, kneel, crouch, and crawl. but should not climb ladders/ropes/scaffolding. She also should avoid concentrated exposure to working at open heights. Her nonexertional limitations restrict her to simple repetitive tasks." R. 27, Finding 7.

The ALJ's findings regarding Lewis's physical residual capacity demonstrate that she was able to meet to the physical demands of her past relevant work as defined by DOT. Lewis's argument that the ALJ failed to make sufficient factual findings regarding the physical demands of her past relevant work is without merit.

B.   **Findings of Fact Regarding Lewis' Ability to Meet the Mental Demands of Her Past Relevant Work**

Lewis also contends that the ALJ erred a failing to make a finding that Lewis's mental health restrictions would permit her to return to her past relevant work. Docket 20 at 13. In terms of mental demands, the job description states that the job "requires ability to carry out detailed but uninvolved written or oral instructions. Involves routine work according to clearly prescribed standard practices, with some latitude for independent judgment." R. 125. The job description further states that it "requires the ability to exercise the judgment, decisiveness, and creativity in situations involving a variety of generally pre-defined duties which are often characterized by frequent change." R. 125. When the ALJ questioned Lewis at the hearing about why she could not perform her prior job, she testified, "I can't do the bending, the lifting, walking up the steps. On the wheelchairs, you have four straps that you have to secure them with, the pulling it. We have to lift 50 pounds and I can't do it." R. 47. Lewis did not testify that she was unable to perform the mental aspects of her prior job. Because Lewis did not contend her mental condition affected her ability to perform her past relevant

work, there can be no error for the ALJ to have failed to make specific findings regarding the mental

requirements of a school bus monitor.

## VI.    **CONCLUSION**

For the reasons stated above, the Court recommends that the decision of the Commissioner be

**AFFIRMED**.

Failure to file written objections to the proposed findings and recommendations in this report

pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within eleven days of the date of its filing shall

bar an aggrieved party from a *de novo* determination by the district court of issues covered in the

report, and shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE AND ORDERED** this 30th day of August, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

The Honorable G. Kendall Sharp
United States District Judge

Mary Ann Sloan, Chief Counsel, Region IV
Dennis R. Williams, Deputy Chief Counsel
Laurie G. Remter, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Albert D. Tutera
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL          32817